No. 95-343

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

MATTHEW C. FULLER,

      Defendant and Appellant.

FILED

APR 16 1996

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Robert W. Holmstrom, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Gary E. Wilcox, Billings, Montana

      For Respondent:

      Joseph P. Mazurek, Attorney General, Jennifer
Anders, Assistant Attorney General; Dennis Paxinos,
Yellowstone County Attorney, John Kennedy, Deputy
Yellowstone County Attorney

Heard and Submitted: January 11, 1996

Decided: April 16, 1996

Filed:

_____
Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

Appellant Matthew C. Fuller (Fuller) was charged in the Thirteenth Judicial District Court, Yellowstone County, with rape and sexual assault. Fuller moved to dismiss the charges, alleging that the State violated his constitutionally guaranteed privilege against compelled self-incrimination. After the District Court denied his motion, Fuller pled guilty to the charges. Fuller appeals the District Court's denial of his motion to dismiss. We reverse.

### ISSUE

Fuller raises two issues on appeal:

1. Did the District Court err in refusing to grant Fuller's motion to dismiss because the State impermissibly violated his constitutionally guaranteed privilege against compelled self-incrimination?

2. Did the District Court err in refusing to grant Fuller's motion to dismiss because his conviction offended the "fundamental fairness" doctrine set out in State v. Theil (1989), 263 Mont. 63, 768 P.2d 343?

Due to the resolution of the first issue, we do not find it necessary to address the second.

### FACTS

The parties stipulated to the facts in this case.

On December 9, 1992, Fuller was charged with three counts of attempted sexual assault. After a bench trial, the District Court found Fuller guilty of all three counts. The District Court

suspended Fuller's sentence but required, among other things, that he "obtain and/or continue his enrollment and participation in [an] outpatient Sex Offender Treatment Program" and "follow all policies of that program." In September 1994, this Court reversed the attempt convictions for lack of evidence, and ordered Fuller to be acquitted of the charges. See State v. Fuller (1994), 266 Mont. 420, 880 P.2d 1340.

After his 1992 conviction but prior to the 1994 reversal, Fuller was accepted into a treatment program in Billings. Patients are not admitted into the treatment program if they are in denial or do not honestly disclose their offense history. Further, patients will be terminated from the program if dishonesty or denial occur during their treatment, if they re-offend during treatment, or if they otherwise break the rules of the treatment program.

The employees of the treatment center are required to report to the authorities any evidence they possess about past or present offenses committed by individuals in the treatment program. Offenders who enter the treatment program are required to fully disclose their offense histories.

During treatment, Fuller prepared and presented to his treatment group an offense history which disclosed several past offenses, including the three at issue here, each of which involved a different prepubescent girl. On March 30, 1994, the treatment program contacted the Probation and Parole Department (the Department) to notify it that Fuller had violated treatment

3

policies. In accordance with its statutory duty, the treatment program also informed the Department of the three prior offenses Fuller had revealed during treatment. The Department in turn notified the Billings Police Department. Fuller subsequently was arrested for unrelated violations of probation.

On April 14, 1994, the State petitioned the District Court to revoke Fuller's suspended sentence. The grounds for revocation did not include the charges which are the basis of the instant appeal. The District Court revoked the suspended sentence and remanded Fuller to the custody of the Montana State Prison.

Meanwhile, the Billings Police Department investigated the incidents Fuller had revealed in treatment and took statements. No investigation had occurred prior to the police department receiving the information obtained from the treatment center. On the basis of the police investigation, Fuller was charged with one count of sexual intercourse without consent and two counts of sexual assault. He moved to dismiss the charges, alleging that the State's actions violated his constitutional privilege against compelled self-incrimination. The District Court denied the **motion.** Fuller then pled guilty to the charges, but specifically reserved his right to appeal the denial of his motion. It is that appeal which we decide today.

### STANDARD OF REVIEW

The grant or denial of a motion to dismiss is within the sound discretion of the trial court and will not be disturbed unless an abuse of that discretion is shown. State v. Barker (1993), 260

4

Mont. 85, 89, 858 P.2d 360, 362-63 (citing State v. Laster (1986), 223 Mont. 152, 724 P.2d 721).

Whether or not a defendant's privilege against compelled self-incrimination is triggered is a conclusion of law. "Our standard of review of a district court's conclusions of law is plenary. We determine whether the district court's conclusions are correct." State v. Sage (1992), 255 Mont. 227, 229, 841 P.2d 1142, 1143 (citing Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 803 P.2d 601).

Fuller alleges that his privilege against compelled self-incrimination was violated. This right is guaranteed to all citizens under both the Montana Constitution and the Fifth Amendment to the United States Constitution. Accordingly, the resolution of Fuller's appeal will rest on Article II, Section 25 of the Montana Constitution, as well as the United States Supreme Court's interpretation of the Fifth Amendment.

## DISCUSSION

Did the District Court err in refusing to grant Fuller's motion to dismiss because the State impermissibly violated his constitutionally guaranteed privilege against compelled self-incrimination?

Montana residents are protected from compelled self-incrimination under both the Montana and the United States Constitutions. Article II, Section 25 of the Montana Constitution provides that "no person shall be compelled to testify against himself in [a] criminal proceeding." The Fifth Amendment to the

5

United States Constitution similarly provides that no person "shall be compelled in any criminal case to be a witness against himself."

All citizens enjoy this constitutional protection, regardless of who they are or how they are situated. It extends beyond trial or custodial situations, because "the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." Estelle v. Smith (1981), 451 U.S. 454, 462, 101 S.Ct. 1866, 1873, 68 L.Ed.2d 359 (quoting In re Gault (1967), 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527). Accordingly, the privilege extends to those already convicted of a crime. Minnesota v. Murphy (1984), 465 U.S. 420, 426, 104 S.Ct. 1136, 1141-42, 79 L.Ed.2d 409 (citing Baxter v. Palmigiano (1976), 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810).

The language of the Fifth Amendment speaks of "compulsion." Therefore, if the State has not compelled the defendant to respond, the Fifth Amendment privilege does not attach. " [A] general obligation to appear and answer questions truthfully [does] not convert otherwise voluntary statements into compelled ones." Murphy, 465 U.S. at 427.

A person claiming the protection of the Fifth Amendment generally must affirmatively invoke it. United States v. Monia (1943), 317 U.S. 424, 427, 63 S.Ct. 409, 410-11, 87 L.Ed.2d 376. This duty to claim the privilege remains with the individual even when the government is unquestionably attempting to compel a response. "[I]f a witness under compulsion to [answer] makes

6

disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." Garner v. United States (1976), 424 U.S. 648, 654, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370. Moreover, a defendant's ignorance of his Fifth Amendment rights generally will not excuse his failure to claim the privilege. An individual may lose the benefit of the privilege without making a knowing and intelligent waiver; if he simply fails to assert the privilege, it will be deemed waived. Garner, 424 U.S. at 654; Maness v. Meyers (1975), 419 U.S. 449, 466, 95 S.Ct. 584, 595, 42 L.Ed.2d 574.

In this case, Fuller never asserted his Fifth Amendment privilege, or, pursuant to it, refused to answer. Instead, he fully and honestly answered the questions put to him by the treatment program, in accordance with the District Court's order. If our inquiry ended here, Fuller would be precluded from assigning error to the District Court's denial of his motion to dismiss.

There is an exception, however, to the general rule that a defendant must affirmatively invoke the privilege in order to enjoy its protections. Failure to invoke the privilege does not preclude the benefit if the defendant is placed in a situation where he is not "free to admit, deny, or refuse to answer." Murphy, 465 U.S. at 429 (citing Garner, 424 U.S. at 657). In such cases, a defendant's privilege against self-incriminating is said to be "self-executing." The United States Supreme Court has applied this exception to three different types of cases.

First, the Supreme Court has held that gamblers may exercise their Fifth Amendment privilege against self-incrimination by refusing to file a federal income tax return. "In recognition of the pervasive criminal regulation of gambling activities and the fact that claiming the privilege in lieu of filing a return would tend to incriminate, the [Supreme] Court has held that the privilege may be exercised by failing to file." Murphy, 465 U.S. at 439 (citing: Marchetti v. United States (1968), 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; Grosso v. United States (1968), 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906; Mackey v. United States (1971), 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404).

Second, the Supreme Court has held that an individual subject to a custodial interrogation must be formally advised of his Fifth Amendment right to remain silent. Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Supreme Court reasoned that a government agency conducting such an interrogation is aware that the responses elicited are likely to be incriminatory. Further, the isolation and intimidating atmosphere inherently found in police custody, whether intentional or not, might undermine the individual's will and compel him to speak when he would otherwise be silent. Murphy, 465 U.S. at 430. Therefore, the Supreme Court has placed upon the government the affirmative duty to inform a suspect of his right to remain silent before questioning him. Miranda, 384 U.S. at 498. However, "this extraordinary safeguard does not apply outside the context of the inherently coercive custodial interrogations for which it was

8

designed."   Murohv, 465 U.S. at 430 (quoting Roberts v. United States (1980) 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622).

Third, the Supreme Court has held that an individual need not formally invoke the privilege if the government prevents a voluntary invocation of the Fifth Amendment by threatening to penalize the individual should he or she invoke it. Murohv, 465 U.S. at 434 (citing Garner, 424 U.S. at 661). This foreclosure of access to the Fifth Amendment is termed a "classic penalty situation." In Murohv, the Supreme Court further explained the classic penalty situation:

> The threat of punishment for reliance on the privilege distinguishes cases of the sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the question put to the probationer, however relevant to his probationary status, calls for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

Murphy, 465 U.S. at 435, (fn. omitted, emphasis added).

Fuller claims the State placed him in a classic penalty situation. He consequently asserts that his failure to invoke the Fifth Amendment should be excused, and that the State is prohibited from using any disclosure made in treatment in a subsequent prosecution. We therefore must evaluate whether the requirements

demanded of Fuller by the District Court placed him in a classic penalty situation.

The District Court ordered Fuller to "obtain and/or continue his enrollment and participation in the outpatient Sex Offender Treatment Program . . [and to] follow all policies of that program . . ." If he failed to comply, his probation would be revoked and he would be sent to prison. The policies of the treatment program required that he fully and honestly disclose his offense history. Again, if he failed to do so, his probation would be revoked and he would be sent to prison. It is therefore undisputed that the State compelled Fuller to divulge past activities which it knew would be criminal.

It is further undisputed that the information divulged by Fuller was self-incriminatory. On the basis of the offense history disclosed, and on that basis alone, Fuller was charged and convicted of three additional crimes.

The State insists these circumstances did not rise to the level of a classic penalty situation because the District Court never threatened to punish Fuller for exercising his Fifth Amendment right. At any time, the State argues, Fuller could have invoked his privilege against self-incrimination. Had he done so, the State further argues, the District Court could not have lawfully punished him for its invocation and his consequent refusal to speak.

While Fuller acknowledges that the District Court never expressly threatened to punish him for relying on the Fifth

Amendment, he argues that such a threat was implicit in its insistence that he speak or be punished. We agree. A command to speak, under threat of loss of liberty, implicitly forecloses the option of remaining silent.

We are therefore unable to imagine how the dissent can assert that the record does not support Fuller's position. The facts in this case are not in dispute; on the contrary, the parties stipulated to them, as we pointed out earlier in this opinion. In the stipulated facts, both parties conceded this issue and that portion of the stipulation is set out verbatim:

> [The District Court] signed a judgment and commitment order sentencing Fuller to ten years on each count to run concurrently. The execution of the sentence was suspended upon the performance by Fuller of certain conditions, [one] of which [was] the following: <u>the defendant shall obtain and/or continue his enrollment and participation in the out-patient sex offender treatment program</u> with a professional who is in compliance with the standards for treatment . . .
>
> After Fuller was first sentenced in January, 1994, he entered sexual offender treatment . . . prior to sentencing, a sexual offender evaluation was ordered by the District Court. Fuller was accepted into treatment prior to imposition of sentence.
>
> <u>Patients are not admitted into a treatment program if they are in denial or do not honestly disclose their offending history. Further, patients will be terminated from the program, if the same occurs during their treatment, they reoffend during treatment, or otherwise break the rules of the treatment programs.</u> [Emphasis added.]

The District Court threatened to send Fuller to prison if he did not honestly disclose his offense history. It therefore threatened a real and significant punishment if he remained silent. The State explains that this threat only applied to unexplained silence, not to silence maintained pursuant to the Fifth Amendment.

11

But it is too fine a distinction to expect an individual to differentiate between exercising a constitutional right to remain silent and merely remaining silent. The threat of punishment implicitly extended to both.

This decision is supported by the United Stated Supreme Court's interpretation of the Fifth Amendment as articulated in Murphy, even though the Supreme Court reached the opposite conclusion in that case. In Murphy the defendant's probation required, among other things, that he participate in a sex offender treatment program, that he report periodically to his probation officer, and that he "be truthful with the probation officer in all matters." Murphy, 465 U.S. at 422. After Murphy left the treatment program, a counselor called his probation officer and informed her that, while in treatment, Murphy had confessed to a rape and murder committed years earlier. When the probation officer confronted Murphy with the information obtained from the treatment counselor, he again confessed to the rape and murder. The probation officer forwarded the information to the police and Murphy was subsequently tried and convicted of the murder. Murohv, 465 U.S. at 422-25.

The Supreme Court found that Murphy had not claimed his Fifth Amendment privilege, and that his was not one of the three exceptional situations where the privilege is self-executing. Specifically, the Supreme Court found that Murphy was not placed in a classic penalty situation because the Minnesota probation revocation statute did not impermissibly foreclose a free choice to

12

be silent.  <u>Murphy</u>, 465 U.S. at 437.  It therefore concluded that Murphy's Fifth Amendment privilege was not self-executing and, since he had not invoked it, that it was properly deemed to have been waived.

Factually, the case at bar is far different.  In <u>Murphy</u>, "[t]he state court did not attempt to define the precise contours of Murphy's obligation to respond to questions.  Murphy's probation condition proscribed only false statements;  it said nothing about his freedom to decline to answer particular questions . . . ." <u>Murphy</u>, 465 U.S. at 437.  In the case at bar, Fuller's obligation was clearly and precisely set out.  He was required to disclose his offense history in order to maintain his place in the treatment program and avoid being sent to prison.  Fuller was directly ordered to incriminate himself;  this is a condition far removed from the general obligation to be truthful that constrained Murphy. Simply put, the State gave Fuller two choices: disclose, or go to prison.

The Supreme Court particularly acknowledged in <u>Murphy</u> that a proper Fifth Amendment analysis might lead to an opposite conclusion--that is, to a holding that the Fifth Amendment was in fact violated--if the defendant faced specifically incriminating questions rather than just a general obligation to be truthful. As we have already noted, the Supreme Court in <u>Murphy</u> held that "[t]he result may be different if the question put to the probationer, however relevant to his probationary status, calls for answers that would incriminate him in a pending or later criminal prosecution."

13

<u>Murphy</u>, 465 U.S. at 435. This is precisely what happened in this case, and precisely why we properly reach a conclusion opposite to that reached by the Supreme Court in <u>Murphy</u>.

The State points out, however, that in reality the District Court could not have revoked Fuller's probation for refusing to disclose his offense history, because this Court has found that it is unconstitutional to revoke probation for failure to admit to a criminal act. See State v. Imlay (1991), 249 Mont. 82, 813 P.2d 979, cert. granted, 112 S.Ct. 1260, cert. dismissed 113 S.Ct. 444 (1992). It therefore contends that there was no real prospect of sanctions if Fuller remained silent, despite Fuller's argument to the contrary. The dissent also devotes much energy to arguing that Fuller's interpretation of <u>Imlay</u> is incorrect.

The District Court threatened to revoke Fuller's probation if he did not remain in the treatment program and follow its policies, including disclosing his offense history. Fuller argued that the district court retained its power to carry out this threat, even in the face of the <u>Imlay</u> decision. The State contended, and the dissent agrees, that <u>Imlay</u> stands for the proposition that a district court does <u>not</u> have the ability to carry out such a threat.

On this point, the majority and dissent do not disagree. The holding in <u>Imlay</u> stands for the proposition that probation cannot be revoked solely on the ground that the defendant refuses to admit that he or she is guilty of a crime. Therefore, the dissent's

claim, that Fuller's reading of <u>Imlav</u> is incorrect, may well have some merit.

We do not minimize the potential importance of the <u>Imlay</u> decision in other cases; however, in this case, the holding in <u>Imlav</u> is largely irrelevant. The dissent emphasizes that the District Court, pursuant to <u>Imlav,</u> lacked the actual ability to carry out its threatened revocation of Fuller's probation if he chose to remain silent. But whether the District Court actually could have carried out its threat is beside the point. It is the issuance itself of a credible threat which is crucial. The District Court, presumably knowing that it could not revoke Fuller's probation if he refused to admit to past crimes (and such admissions are certainly what the phrase "offense history" contemplates), nevertheless threatened to do exactly that. Fuller cannot be faulted for taking the District Court at its word and acting accordingly.

Moreover, the reliance by the State and the dissent on the <u>Imlav</u> decision ignores the realities of Fuller's situation. s under a court order to comply with the policies of the treatment program; he was told that if he failed to do so, his probation would be revoked. He believed the District Court had the authority and the ability to carry out its threat, and that belief was eminently reasonable. It is far less reasonable to expect him to know that the threat was an empty one.

The State next argues that this entire situation would never have arisen if Fuller had been honest with the State in plea

15

negotiations, revealing the three previous crimes to the State or to the District Court at an earlier date. If Fuller had disclosed the offenses earlier, however, presumably the State would have prosecuted him earlier. It has never been incumbent upon a defendant to assist the State in his own prosecution. Fuller's failure to do so is not relevant to the question of whether his Fifth Amendment privilege was violated.

Nor do we find Fuller's lack of knowledge of the particularities of this area of law to be "ludicrous," as the dissent apparently does. Considering that the learned members of the United States Supreme Court, the learned members of this Court, and a myriad of legal scholars cannot agree on the exact parameters of an individual's privilege against compelled self-incrimination, it would be ludicrous to expect a lay-person defendant to appreciate its intricacies. Every schoolchild may be familiar with the Fifth Amendment as a concept, as the dissent claims. That does not, however, translate to a widely-held understanding of its every nuance and subtlety.

Following the analysis set out in Murphy, the proper inquiry is "whether [a defendant's] probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went further and required him to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent." Murphy, 465 U.S. at 436. This latter "required choice" is precisely and solely what the State offered in Fuller's case. This is "the extra,

16

impermissible step" which serves to make the Fifth Amendment privilege self-executing. <u>Murphy</u>, 465 U.S. at 436.

Because the State improperly compelled Fuller to disclose past criminal acts in violation of his Fifth Amendment privilege against compelled self-incrimination and his constitutionally guaranteed right to remain silent, it is prohibited from using any of the information elicited as the basis for a later, separate criminal prosecution. Therefore, the District Court erred in denying Fuller's motion to dismiss on these grounds. While we have devoted considerable time to a lengthy discussion of the application of the Fifth Amendment to the United States Constitution, it is to be noted that this holding is also based separately and independently on Fuller's right to remain silent pursuant to Article II, Section 25 of the Montana Constitution.

We emphasize that this holding does not stand for the proposition that the State may not compel a defendant to answer. It can; indeed, in order for treatment to be effective, it must, because a defendant who refuses to disclose his offense history cannot be successfully treated. However, if the State chooses to compel answers to incriminating questions, it cannot use those answers against the defendant in a later criminal proceeding.

Judgment reversed.

_William E Hunt Sr_
Justice

We Concur:

_____
Chief Justice

17

_____


_____



_____


_____
Justices

Justice Terry N. Trieweiler concurring.

I concur with the majority opinion and all that is included in its discussion. I write separately to respond to the dissenting opinion which seems to unnecessarily confuse what should be a straightforward application of clear constitutional principles.

The Fifth Amendment of the United States Constitution provides in relevant part that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself."

Article II, Section 25, of the Montana Constitution provides that "[n]o person shall be compelled to testify against himself in a criminal proceeding."

The United States Supreme Court has noted that:

> It has long been held that this prohibition [the Fifth Amendment] not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*Minnesota v. Murphy* (1984), *465 U.S. 420,* 426 (quoting *Lefkowitz v. Turley* (1973), *414 U.S. 70, 77).*

I would hold that Montana's constitutional right to avoid self-incrimination found at Article II, Section 25, is similarly applicable to formal or informal proceedings when a person's answers might incriminate him or her in future criminal proceedings.

The undisputed facts in this case clearly establish that Fuller was compelled to provide information about his own criminal

19

conduct which then formed the basis for his prosecution for that conduct. The District Court's order dated January 27, 1994, which suspended Fuller's original sentence provided in part as follows:

[S]aid prison sentence is suspended upon the following conditions . . . :

. . . .

12. The defendant shall obtain and/or continue his enrollment and participation in the outpatient Sex Offender Treatment Program with a professional who is in compliance with the standards for treatment developed by the Montana Sex Offender Association. <u>The defendant shall follow all policies of that program</u> and shall not terminate from such treatment without prior approval of his Supervising Officer.

. . . .

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that if the defendant fails to comply with any of the above-conditions, a bench warrant of arrest will be issued, the defendant apprehended, and the said defendant will be required to appear before this Court for further proceedings.

(Emphasis added.)

The stipulated facts subscribed to on behalf of the State of Montana by the Deputy Yellowstone County Attorney and filed with the District Court as the basis for its decision provide the following undisputed information about the requirements for Fuller's satisfactory completion of the sex offender program which was a condition to the suspension of his sentence:

Patients are not admitted into the treatment program if they are in denial or do not honestly disclose their offending history. . . .

Employees of South Central Treatment Associates are under a statutory duty to report any evidence they possess about past or present offenses committed by

20

> individuals in their treatment program. . <u>Offenders
> who enter in the treatment program are required to fully
> disclose their offense histories.</u> . . .
>
> . . .
>
> . . . Exhibit E represents an offense history
> prepared by Fuller pursuant to treatment rules and
> presented in group on February 15, 1994, which reflect[s]
> the incidents which are the subject of this case.

(Emphasis added.)

No fair and objective review of the record before this Court can lead to any conclusion other than that Fuller was compelled by order of court to participate in a program which required that he admit prior criminal offenses and that those admissions then formed the basis of the State's prosecution of Fuller in this case. These compelled admissions, therefore, violated the federal and state constitutional rights against self-incrimination.

The dissent takes the position that all of the above was perfectly okay because had Fuller chosen to test the District Court's authority to do what it threatened to do (put him in prison) he probably could have succeeded pursuant to our decision in *State v. Imlay* (1991), 249 Mont. 82, 813 P.2d 979. The dissent misses the point from any practical perspective.

The United States Supreme Court, in *Miranda v. Arizona* (1966), 384 U.S. 436, recognized that the right to remain silent in the face of custodial interrogation by law enforcement officials was meaningless to the average person unless that person was informed of his or her constitutional right. The U.S. Supreme Court therefore held that before persons suspected of committing a crime

21

can be interrogated in a custodial situation, they must be advised of the right to remain silent and the consequences of failing to do so.

The dissenting opinion, however, proceeds from the assumption that while the average person cannot be expected to understand that he or she has a Fifth Amendment right, that same person should be fully aware of his or her rights pursuant to this Court's decision in *Imlay*, even though that person is specifically instructed to the contrary by agents for the State. The logic of that conclusion escapes me.

I, for one, as the author of *Imlay*, recall the outcry from the Attorney General's Office and prosecutors in this State about their surprise at that decision. Their complaint was that it was totally unforeseeable and unjustified by the prior decisions of this Court or the federal courts. While I strongly disagree, I am now at a loss to understand how the result could have been so unforeseeable to people with legal educations and years of experience in the area of criminal and constitutional law, and yet some totally uneducated and uninformed suspect is supposed to be aware of the case's implications.

I suppose there have been stranger arguments made before this Court. However, none come immediately to mind.

This is a classic penalty case. Fuller was told that he either report accurately and completely his prior history of sex offenses or he would not be allowed to remain in his treatment

22

program and his suspended sentence would be revoked. Revocation of his suspended sentence meant imprisonment. He was never advised that he had a right pursuant to this Court's decision in *Imlay* to refuse to disclose his prior history of offenses and that he could not be sent to prison for doing so. There could not be a clearer threat of penalty for exercise of a person's right to remain silent.

The dissent's suggestion that we have no basis for concluding that Fuller admitted his prior offending history because it was a requirement of his treatment program is incorrect. The quoted portion of the District Court's order and the facts to which the State stipulated make that fact absolutely clear. Furthermore, in case after case before this Court we have been told that admission of the offending history is a condition to participation in a sex offender treatment program. *See State v. Skroch* (1994), 267 Mont. 349, *357, 883* P.2d 1256, 1262; *State v. Cameron* (1992), 253 Mont. 95, 108, *830* P.2d 1284, 1292-93 (Trieweiler, J., dissenting) ; *Imlay*, 249 Mont. at 85-86, 813 P.2d at 982; *State v. Donnelly* (1990), 244 Mont. 371, *381,* 798 P.2d 89, 95.

The dissent suggests that the U.S. Supreme Court's decision in *Murphy* clearly does not provide for immunity from prosecution based on the statements which are the subject of this appeal. If that conclusion is as obvious as the dissent suggests, I find it interesting that the State took just the opposite position before

the United States Supreme Court when it argued *State v. Imlay* (1992), 506 U.S. 5. Although the writ of certiorari was dismissed in that case as improvidently granted, Justice White dissented. In his dissenting opinion, he noted that:

> At oral argument, however, two further questions were raised concerning whether any live controversy persists in this case. . . . Second, counsel for petitioner [the State of Montana] stated his belief that a probationer would enjoy immunity from prosecution for incriminating statements made during court-ordered therapy. This statement calls into doubt a critical assumption underpinning the Montana Supreme court's judgment and might suggest that there really is no disagreement about the Fifth Amendment's application to this case.
>
> , . This "concession" appeared to rest solely on the State's assumption that this Court's decision in Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984), mandated such a result.

*May,* 506 U.S. at 5, 7-E (White, J., dissenting).

Apparently, even the Attorney General's Office did not agree with the dissent's interpretation of *Murphy* when the opposite interpretation was to its greater advantage.

Finally, I find it incredible that the dissent bemoans the fact that someone compelled to admit offenses should be given immunity from prosection as a result of those disclosures. Immunity for compelled disclosures is nothing new. It is provided by statute. See § 46-15-331, MCA. The dissent does nothing less than suggest that the State's ability to enforce the law depends on its ability to compel citizens to disclose incriminating information about themselves. This suggestion would completely

24

abrogate the plain language of the Fifth Amendment and Article II, Section 25, of the Montana Constitution. Law enforcement has successfully operated for over 200 years, in spite of the constraints imposed by the Fifth Amendment.

The nearly hysterical tone of the dissent's concerns is totally inconsistent with its initial legal conclusion. On the one hand, the dissent argues that Fuller should have known that pursuant to our decision in *Imlay* he had a right to refuse to disclose any prior offending history (in which event no one would have known about it; he could not have been prosecuted for it; and his victims could not have been treated). On the other hand, the dissent suggests that if he does disclose that prior history in an effort to be effectively treated and the State cannot prosecute him on the basis of his compelled disclosures, the criminal justice system, as we now know it, will somehow crumble and the citizens of this state will be unsafe in their homes. How the two positions can possibly be reconciled is never explained.

I would suggest that the general public in Montana is much better off in the long term by effective treatment of sex offenders and their **victims,** which complete and open disclosure would further, than by the dissent's first suggestion which is that Fuller could have simply remained in the program and avoided revocation of his suspended sentence by invoking his right pursuant to *Imlay* to conceal his prior offending history.

25

I conclude that while the dissent may make sensational reading for nonlawyers, it makes little sense from a constitutional point of view, and if followed, it would impair the State's ability to effectively treat sex offenders and their victims.

_____
J stice

Justice Karla M. Gray joins in the foregoing concurring opinion.

_____
Justice

Justice James C. Nelson dissenting.

I dissent from the Court's decision in this case. In summary, I would hold that under our interpretation of State v. Imlay (1991), 249 Mont. 82, 813 P.2d 979, cert. dismissed as improvidently granted, (1992), 113 S.Ct. 444, even if Fuller had been dismissed from or refused treatment under the sex offender treatment program because he invoked his Fifth Amendment right to not incriminate himself by disclosure of other uncharged sex offenses, his probation could not have been revoked. Accordingly, Fuller was under no explicit or implicit threat of sanction or penalty for exercising his Fifth Amendment right to remain silent. He did not, in fact, face a "classic penalty" situation or "Hobson's choice" that would have rendered his right against self-incrimination self-executing. Therefore, he was required to actually invoke that right, and in failing to do so, he waived his Fifth Amendment protection against self-incrimination and subjected himself to criminal prosecution for the other crimes which he voluntarily disclosed.

The Fifth Amendment's protection against compelled self-incrimination not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. Minnesota v. Murphy (1984), 465 U.S. 420, 426, 104 S.Ct. 1136, 1141, 79 L.Ed.2d 409, 418 (quoting Lefkowitz v. Turley (1973), 414

27

U.S. 70, 77, 94 S.Ct. 316, 322, 38 L.Ed.2d 274, 281). see also Seizure of $23,691.00 in U.S. Currency (Mont. 1995), 905 P.2d 148, 152, 52 St.Rep. 1063, 1065, where we cited with approval this same rule.

However, except in certain circumstances hereafter discussed, the privilege against self-incrimination is not "self-executing." Rather, it must be affirmatively claimed. In other words, a general obligation to appear and answer questions truthfully does not in itself convert a person's otherwise voluntary statements into compelled ones. A person's answers to questions put to him are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of privilege. Murphy, 465 U.S. at 427. If the person desires the protection of the privilege he must claim it or his answers will not be deemed compelled for Fifth Amendment purposes. Murphy, 465 U.S. at 427 (quoting United States v. Monia (1943), 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376, 380).

Moreover, "if a person under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself," Murphy, 465 U.S. at 427 (quoting Garner v. United States (1976), 424 U.S. 648, 654, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370, 377) and those disclosures are deemed voluntary and may be used against him in a subsequent criminal prosecution. Murphy, 465 U.S. at 440. This is true even where the government should reasonably expect the questions to elicit incriminating evidence (Murphy, 465 U.S. at 429), where the

nature of the questions asked are incriminating (Murphy, 465 U.S. at 428 (quoting Monia, 317 U.S. at 433 and citing United States v. Mandujano (1976), 425 U.S. 564, 574-75, 96 S.Ct. 1768, 1775-76, 48 L.Ed.2d 212, 221)) or where the person alone is reasonably aware of the incriminating tendency of the questions (Murphy, 465 U.S. at 428 (Brennan, J., concurring) (quoting Roberts v. United States (1980), 445 U.S. 552, 562 n*, 100 S.Ct. 1358, 1365 n*, 63 L.Ed.2d 622, 632 n*)). If the person being questioned chooses to answer, his choice is considered to be voluntary because he was free to claim the privilege, because he was privileged to decline to answer and because he would suffer no penalty if he did so. Murphy, 465 U.S. at 429.

Here, as the majority recognizes, it is undisputed that Fuller failed to assert his Fifth Amendment privilege and decline to disclose evidence of his other uncharged **sex crimes in** response to questions posed by the therapist. Notwithstanding, Fuller claims that his case is within one of the exceptions to the above-stated rule that the Fifth Amendment's protection against self-incrimination is not self-executing, but, rather, must be affirmatively asserted. The Court in Murphy described this exception, known as the "classic-penalty" situation or "Hobson's choice," (Murphy, 465 U.S. at 443 (Marshall, J., dissenting)). The Court stated:

> The general rule . . . has also been deemed inapplicable in cases where the assertion of the privilege is penalized so as to "foreclos[e] a free choice to remain silent, and . . compe[l] incriminating testimony." Garner 424 U.S. at 661.

29

* * * *

     In each of the so-called "penalty" cases, the State not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions "capable of forcing the self-incrimination which the Amendment forbids. Leftowitz v. Cunningham (1977), 431 U.S. 801, 805, 97 S.Ct. 2132, 2135, 53 L.Ed.2d 1, 7

* * * *

These cases make clear that "a State my not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself. <u>Lefkowitz,</u> 431 U.S. at 805.

* * * *

[I]f the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution.

<u>Murphy</u>, 465 U.S. at 434-35.

When faced with a classic penalty situation or Hobson's choice--i.e. being forced to choose between self-incrimination and suffering a sanction or penalty for choosing to remain silent--the Fifth Amendment privilege against self-incrimination is "self-executing." It does not have to be affirmatively asserted or claimed. <u>See</u>, <u>Cunningham</u>, 431 U.S. at 805; <u>Turley,</u> 414 U.S. at 79-84; Sanitation Men v. Sanitation Comm'r (1968), 392 U.S. 280, 283-84, 88 S.Ct. 1917, 1919, 20 L.Ed.2d 1089, 1092; Gardner v. Broderick (1968), 392 U.S. 273, 278-79, 88 S.Ct. 1913, 1916, 20 L.Ed.2d 1082, 1087; Garrity v. New Jersey (1967), 385 U.S. 493, 498-99, 87 S.Ct. 616, 619, 17 L.Ed.2d 562, 566.

Fuller claims, and the majority agrees, that he was faced with just such a classic penalty situation or Hobson's choice. He argues that he was required to honestly disclose his offending history in order to complete his sex offender program which was, in turn, a requirement of his probation. He contends that he was faced with the choice of truthfully disclosing his uncharged other sex crimes and facing criminal prosecution or not disclosing truthfully and being subject to termination from the sex offender program and revocation of probation.

Fuller's argument fails, however, because he and the majority ignore his third alternative. Fuller could have asserted his Fifth Amendment right to not incriminate himself. He could have simply refused to say anything about his uncharged sex offenses. This option was available to Fuller because under Imlay, had he chosen to remain silent, the State could not have imposed any sanction whatsoever against him for his assertion of his Fifth Amendment right. It could not have revoked his probation even if his participation in the sex offender program was terminated by reason of his refusal to disclose his uncharged sex offenses. Imlay, 813 P.2d at 985.

The majority ignores the fact that Fuller's position is premised in large part on his erroneous and unreasonable reading of our decision in Imlay. While in order to reach the result sought, the majority baldly declares that Imlay is beside the point and is irrelevant, it is precisely because of this Court's decision in Imlay that Fuller's right against self-incrimination was not self-

executing for Fifth Amendment purposes--there was absolutely no sanction which the State could impose on Fuller if he chose to exercise his right to remain silent. Moreover, Fuller did not consider Imlay beside the point or irrelevant. In fact, on brief and at oral argument, Fuller premised his position on his interpretation of our decision in that case, and he spent considerable effort arguing that Imlav did not prohibit the State from revoking his probation if he exercised his Fifth Amendment rights and refused to disclose his prior offending history. As Fuller stated on brief:

> Two central questions control the decision in this case. Will the court determine that Minnesota v. Murphy 104 S. Ct. 1136 (1984) controls? Is *this court willing to expand its holding in State v. Imlav 813 P.2d 979 (Mont., 1991)?* (Emphasis added).

However, while Fuller narrowly reads Imlay and argues that our holding in that case would not have precluded the trial court from revoking his probation because "all Imlav prohibits is revocation of a suspended sentence because of refusal to admit guilt to the charged crime," that clearly is not what our opinion stands for. We stated in Imlav:

> [B]y admitting guilt in this case, the defendant would have to abandon his right guaranteed by the Fifth Amendment, *not only as to the crime for which he has been convicted, but also to the crime of perjury* [since he had testified in is own defense at trial and denied committing the offense with which he was charged.1

Imlay, 813 P.2d at 985 (emphasis added). See also State v. Henrich (1994), 268 Mont. 258, 273, 886 P.2d 402, 411 (stating "Imlay prevents a sentencing court from incarcerating a defendant for refusing to confess to the crime in order to complete treatment

32

that is a condition of a suspended sentence"). The State has correctly interpreted _Imlav_ as precluding the revocation of probation because of the defendant's refusal to admit to not only the charged crime but to any other crime as well. The District Court correctly interpreted _Imlav_ as mandating that result. e interpret _Imlav_ in the same way.

Moreover, even the United States Supreme Court acknowledged that, clearly, the government cannot constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege. _Murvhv_, 465 U.S. at 438. Fuller stands alone in his misreading of _Imlav_; his position is unreasonable and finds no support in either federal or state law. It is precisely because of our decision in _Imlav_ that Fuller's Fifth Amendment right against self-incrimination was not self-executing, and it is because of _Imlav_ that the majority decision, here, is wrong. That the majority chooses to disregard _Imlav_ , accordingly, understandable. Its choice to simply ignore the law does not, however, render its legal analysis correct.

In short, there was nothing that would have prevented Fuller from exercising his Fifth Amendment right and refusing to disclose his offending history. Even if he was terminated from the sex offender program, his probation could not, as matter of state and federal law, have been revoked. While Fuller was, without doubt, faced with a difficult, technical choice as to whether to disclose his sex offending history or to stand on his right to remain silent, he was not, in fact or in law, faced with a classic penalty

33

situation nor with a Hobson's choice as the majority has erroneously concluded.

In truth, Fuller, who was not sworn, who was not in a custodial interrogation and who was not under a subpoena when he made his disclosures, was faced with even less intimidating pressure than is a person who is compelled to tell the truth upon being required to testify in court, before a grand jury or in some other proceeding where he is under subpoena, is sworn and is under pain of contempt. Even in those circumstances the law is clear that the witness must affirmatively assert his Fifth Amendment privilege, and, in the usual case, must do so on the basis of his own knowledge of his rights, without the benefit of any prior *Miranda* warning (which is not required, in any event, since there is no custodial interrogation) and without the benefit of counsel. If the witness fails to claim his Fifth Amendment right to remain silent, his statements can be used against him in a subsequent criminal prosecution. See <u>Murvhv</u>, 465 U.S. at 427, 430-31.

Here, Fuller was at all times represented by counsel from whom he could have sought advice as to the exercise of his Fifth Amendment rights and as to the consequences of his doing so. Knowing that he would have to disclose his sex offending history as part of his sex offender treatment, he could have sought immunity from prosecution during plea negotiations. He availed himself of neither option.

Moreover, the actual record in this case does not support Fuller's position. Neither the portion of the stipulated facts

relied upon by the majority nor any other part thereof state or imply, much less concede, that Fuller was ever told, threatened or led to believe that the exercise of his Fifth Amendment right would result in his being sanctioned.

Rather, as the District Court found, and as Fuller concedes, he was never told or led to believe that the exercise of his Fifth Amendment privilege would result in revocation of his probation, and there is no evidence in the record that Fuller admitted to his prior crimes because he feared revocation if he chose to remain silent. There is no evidence that Fuller was deterred from claiming his Fifth Amendment privilege by the threat of revocation. There is nothing in the stipulated facts which describes any subjective belief on Fuller's part that he would be sanctioned for exercising his Fifth Amendment right to remain silent or that he was under any real threat, explicit or implicit, that his probation would be revoked.

To the contrary, we are left only with Fuller's self-serving, after-the-fact justifications for his failure to assert his privilege against self-incrimination and his unreasonable interpretation of _Imlay_--an interpretation which flies not only in the face of the clear language of that opinion but in the face of _Murphy_ which he and the majority, cite as authority for their position. In this regard, the only reason Fuller relies upon and argues _Murphy,_ is that he misreads _Imlay_, erroneously maintaining that our decision in that case would permit the revocation of his probation if he had exercised his Fifth Amendment privilege to

35

remain silent.  No one agrees with that contention.

While the majority cites <u>Murphy,</u> it does so on the proposition that Fuller's case and <u>Murphy</u> are factually "far different." Nothing could be further from the truth.  The facts are almost identical.  Murphy's incriminating statements, like Fuller's, were first made to his sex offender treatment program counselor, and, as here,  it was the counselor who reported the previously unknown **crimes** to the probation officer, who in turn reported to the police.  <u>Murphy,</u> 465 U.S. at 423.

While the majority states that Murphy's obligation to tell the truth was only a general obligation, and Fuller's was "clearly and precisely set out," this is  truly a distinction without a difference.  As the <u>Murphy</u> opinion states:

> [t]he terms of Murphy's probation required, among other things, that he participate in a treatment program for sexual offenders at Alpha House, report to his probation officer as directed, an be truthful with the probation officer "in all matters." Failure to comply with these conditions, Murphy was informed,  could result in his return to the sentencing court for a probation revocation hearing.

<u>Murphy,</u> 465 U.S. at 422. Accordingly, whether the obligation to be truthful was general or specific, it is clear that Murphy was faced with precisely the same sort of pressure of potential sanction for lying (revocation of probation and imprisonment) as was Fuller. Of more  importance  is the fact that in neither <u>Murphy</u> nor in the instant case was there any proscription of the defendant's freedom to decline to answer particular questions and no suggestion that either's probation was conditional  on his waiving his Fifth Amendment privilege with respect to further criminal prosecution.

36

See, Murphy, 465 U.S. at 437.

Moreover, any implication that Fuller--a person who was already well acquainted with the criminal justice system--did not appreciate or understand his right to remain silent is ludicrous. As the Supreme Court noted:

> [a]t this point in our history virtually every schoolboy is familiar with the concept, if not the language, of the [Fifth Amendment].

Murphy, 465 U.S. at 437 (citing Michigan v. Tucker (1974), 417 U.S. 433, 439, 94 S.Ct. 2357, 2361, 41 L.Ed.2d 182, 190).

Contrary to the majority's opinion, Murphy and the instant case are on all fours, and the same result should, accordingly, obtain. Yet, incredibly, this Court relies on Murphy to come to precisely the opposite result on the same essential facts.

As in Murphy, Fuller was not faced with a classic penalty situation or a Hobson's choice. His right to be free from self-incrimination was not self-executing, and his incriminating disclosures of his prior uncharged sex crimes were not compelled within the meaning of the Fifth Amendment. As a result, he could not prevent his volunteered disclosures from being used against him in the subsequent criminal prosecutions at issue here. See Murphy, 465 U.S. at 437-40. The majority's conclusion to the contrary is wrong.

The foregoing aside, it also deserves mention that the ramifications of today's opinion go beyond the mere reversal of Fuller's conviction and his premature release from a much-deserved, lengthy term of imprisonment. Rather, the greater mischief in the

majority's decision is that in failing to apply to this case the well-established rules and principles that a correct Fifth Amendment analysis requires, we have now effectively established a rule of absolute immunity from prosecution for criminal defendants who confess (and who now, according to our opinion, *must* confess) to otherwise unknown crimes during sex offender treatment. Now, when the defendant tells all his past crimes to the therapist, he obtains complete absolution and a plenary indulgence; he's home free. There will henceforth likely be more sins forgiven in sex offender treatment than in the confessional.

In <u>Murphy</u>, the defendant, as part of sex offender treatment, disclosed a previously unknown homicide perpetrated as part of a previously unknown rape. Just like Fuller, he sought to suppress his statements in connection with his subsequent prosecution for the undisclosed crimes on the basis that his confession was obtained in violation of his Fifth Amendment right against <u>self</u>-incrimination. <u>Murphy,</u> 465 U.S. at 422-25. By applying a proper Fifth Amendment analysis, as discussed above, the Court concluded that Murphy's statements were voluntary, were not compelled and that he could be prosecuted. <u>Murphy,</u> 465 U.S. at 440. That will, henceforth, not be the result in Montana under our decision here. Fuller and similarly situated defendants, unlike Murphy, will never be brought to justice for their crimes. As a result of this decision, it will be interesting indeed, to watch the legal cartwheels when some defendant first confesses to a previously unknown homicide during sex offender therapy.

Furthermore, as pointed out above, it is well-established that a witness who is sworn and compelled to testify truthfully in court, in some other legal proceeding or before a grand jury on the pain of contempt does not need to **be** given a *Miranda warning,* but, rather, must affirmatively assert his Fifth Amendment privilege in order to avoid incriminating himself. See <u>Murphy</u>, 465 U.S. at 431. That long-standing legal principle is now very much in question as a result of our decision here. Any witness who incriminates himself can now make the same argument as Fuller. "Nobody told me I had to assert my Fifth Amendment right, or that I even could. Since I was subpoenaed to testify and sworn to tell the truth, I figured I didn't have any other choice and that I'd be thrown in jail for contempt if I didn't testify." Presumably, such a witness will be able to cite our decision in this case for the rule that, under such circumstances, his incriminating statements cannot be used against him in a subsequent criminal prosecution.

How the various participants in the criminal justice system in Montana will now deal with the rule we have established remains to be seen. We have, in my view however, ignored well-established principles of Montana and federal law to reach a result that is grounded in nothing more than the illogical proposition that even where the record and the law do not support the conclusion that Fuller was required to incriminate himself, he was "compelled" nonetheless. In doing so, we have misapplied a U.S. Supreme Court decision factually and legally on point and we have unnecessarily undone a whole body of Fifth Amendment law. Worse, in the process

we have created much greater and more serious problems that will have ramifications far beyond the fact situation presented here

    I would affirm the decision of the District Court, and I dissent from our failure to do so.

                                                _____
                                                  Justice

Chief Justice J.A. Turnage and Justice Charles E. Erdmann concur in the foregoing dissent.

                                              _____
                                              Chief Justice

                                              _____
                                              Justice